UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFF CORBIN,<br><br>                    Plaintiff,<br><br>          v.<br><br>ERIC MORGAN, SIMON YU, HASAN ASKARI, SUJIT BANERJEE, THEIRAPP, INC. d/b/a APPRISE MOBILE, K4 PRIVATE INVESTORS, L.P., K1 INVESTMENT MANAGEMENT, LLC, and K4 CAPITAL ADVISORS, L.P.,<br><br>                    Defendants. | No.:20-cv-_____( ) ( )<br><br><br>**COMPLAINT**<br><br>JURY TRIAL REQUESTED |

Plaintiff Jeff Corbin ("*Corbin" or "Plaintiff*"), by his attorneys, Sack & Sack, LLP, as and for his Complaint against Defendants Eric Morgan ("*Morgan*"), Simon Yu ("*Yu*"), Hasan Askari ("*Askari*"), Sujit Banerjee ("*Banerjee*"), theIRapp, Inc. d/b/a APPrise Mobile ("*theIRapp," or "Company*"), K4 Private Investors, L.P., K1 Investment Management, LLC and K4 Capital Advisors, L.P. (collectively the K4 defendants and defendant K1 Investment Management are referred to as "*K1*" or "*Defendants*") states and alleges as follows:

## NATURE OF THE ACTION

1.     The action set forth herein is based upon Defendants' breach of the express written terms and conditions of the agreement it entered into with Corbin as of February 14, 2019 (the "*Employment Agreement*," Ex. 1).

2.     Specifically, Defendants have failed and refuse to pay Plaintiff his contractually owed "Put Right" (valued at a predetermined $11,786,000) on Corbin's 8,300,000 shares and post-employment "Severance" payments (valued at $225,000).

3.      Solely for the purpose of protecting their investment in theIRapp, Defendants K1 have acted deliberately, willfully and intentionally to interfere with the Employment Agreement and to deprive Corbin of his ability to recover what he is entitled to on his contractually owed Put Right and Severance.

4.      As and for Defendants' breach of and intentional interference with the Employment Agreement, Corbin seeks damages in the amount of at least **$11,786,000** for the Put Right and **$225,000** for post-employment Severance owed to him, plus, interest, attorney's fees and costs.

5.      By the filing of this Complaint, Corbin seeks adjudication and judgment on the merits of his lawful entitlement to those monetary sums due him totaling **$12,011,000**, as set forth in detail herein.

## JURISDICTION & VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a). The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Venue is appropriate in this district under 28 U.S.C. § 1391(a). The acts which give rise to this Complaint took place in this District.

## PARTIES

8.      At all relevant times, Plaintiff resided at 12 Oakdale Road, Larchmont, New York 10538.

9.      Defendant Eric Morgan resides at 2519 Lucky John Drive, Park City, UT 84060.

10.     Defendant Simon Yu resides in California c/o K1 Investment Management, 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266.

11.    Defendant Hasan Askari resides in California c/o K1 Investment Management, 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266.

12.    Defendant Sujit Banerjee resides in California c/o K1 Investment Management, 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266.

13.    Defendant theIRapp, Inc. d/b/a APPrise Mobile is a Delaware C Corporation with offices at 950 Third Avenue, New York, NY 10022.

14.    Defendant K4 Private Investors, L.P. is a Delaware limited partnership with offices at 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266 and is the majority and controlling shareholder of Defendant theIRapp, Inc.

15.    Defendant K1 Investment Management, LLC is a Delaware limited liability corporation with offices at 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266 and is a general partner of Defendant K4 Private Investors, L.P.

16.    Defendant K4 Capital Advisors, L.P., is a Delaware limited partnership with offices at 875 Manhattan Beach Blvd, Manhattan Beach, CA 90266 and is a general partner of Defendant K4 Private Investor, L.P.

**FACTS**

The claims set forth herein arise from the following set of facts:

**BACKGROUND**

17.    theIRapp began in 2011 as an idea for a new form of communications technology conceived by Jeff Corbin, the CEO of KCSA Strategic Communications ("*KCSA*"), a New York City public relations and communications consulting firm, and Jason Mayde (*"Mayde"*), KCSA's Head of Information Technology ("IT").

3

18.     KCSA incubated and funded the development of the idea behind theIRapp, which was to develop a white-labeled/company branded mobile app for Apple and Android mobile devices that would allow publicly traded companies to be able to aggregate, organize and push investor related information and communications to their investors through the small screens of their mobile devices.

19.     As CEO of KCSA, Corbin charged Mayde with developing a prototype of the product that would eventually be called theIRapp.

20.     Once Mayde developed the prototype, Corbin believed that it could be sold commercially and KCSA funded its continued development.

21.     In June of 2012, Corbin and Mayde attended the Annual Conference of the National Investor Relations Institute (NIRI) in Seattle, Washington where they launched theIRapp product.

22.     The NIRI conference was attended by nearly 1,000 investor relations professionals from publicly traded companies.

23.     Following the event, internationally recognized companies started to sign annual subscription contracts for theIRapp and KCSA started to generate revenue as a result.

24.     Prior to attending the NIRI conference, Corbin created theIRapp, LLC on March 21, 2012 to separate this new technology venture from the KCSA consulting business.

25.     Towards the latter part of 2013, Corbin was approached by the head of corporate communications at publicly traded Sysco Corporation (the food distribution company), a customer of theIRapp product.

26.     The head of corporate communications at Sysco told Corbin that the company had a real challenge when it came to communicating with and distributing information to its more

than 60,000 employees, as the vast majority of them were not sitting in office settings and using desktop computers as part of their day-to-day work. Many Sysco employees did not have corporate email addresses or access to the company's intranet. They were "deskless."

27.     He went on to say to Corbin that if Sysco could have a second app with the Company similar to theIRapp which would be dedicated for use by its employees that could allow Sysco, in real time, to push information directly to their personal mobile devices and to send them important communications and know that they received them, this could be game changing for Sysco.

28.     Corbin was excited to hear this suggestion and consequently, theIRapp immediately embarked on an effort to develop this application for Sysco's workforce.

29.     Eventually, Sysco entered into an agreement with theIRapp, LLC to develop this employee application.

30.     Consequently, "theEMPLOYEEapp" product was created and KCSA began to fund and market it to small, medium and enterprise sized companies around the world.

31.     Upon learning about theEMPLOYEEapp, companies including Toyota North America, Caesars Entertainment, Northwell Health (along with numerous other hospital systems), Chipotle and companies from other industries employing predominantly "deskless" workers began signing annual contracts for theEMPLOYEEapp.

32.     By the end of 2014, the Company was generating nearly $1 million in annual recurring revenue ("*ARR*").

33.     Up until this point in time, KCSA had been funding the expenses associated with theIRapp product and now "theEMPLOYEEapp."

34.     Now, Corbin determined that it was an appropriate time to raise outside capital to

further the Company's growth.

35.     In early 2015, Corbin commenced a friends and family "Seed" equity capital raise and over the next few months, he raised more than $1 million to further the development and growth of theEMPLOYEEapp.

36.     Before embarking on the "Series Seed" capital raise, on May 12, 2015, Corbin formed theIRapp, Inc., a Delaware C-Corporation.

37.     The theIRapp, LLC was merged into the Delaware C-Corporation, theIRapp, Inc.

38.     By the end of 2015, Corbin was spending more time on this nascent business and amicably separated from KCSA to run theIRapp, Inc. full time as its Chief Executive Officer.

39.     During 2016, the Company continued to grow.

40.     By the end of 2017, the Company was generating more than $2.5 million in ARR from more than 150 customers.

41.     Corbin had created and pioneered the beginning of a new market in technology for the ever-changing needs of a mobile workplace that is now referred to by technology analyst group, Gartner, as "Employee Communications Applications."

42.     In fact, in 2016, Gartner selected the Company to be one of its "Cool Vendors," a distinguished and well-recognized honor to receive in the technology industry.

43.     Given the success that the Company was experiencing, in May 2018 a junior analyst from defendant K1 called Corbin to introduce him to K1, a growth and private equity firm located in Los Angeles.

44.     Corbin learned that K1 only focuses on and invests in technology companies, particularly cloud-based software-as-a-service (SaaS) companies.

45.     A month later, a member of K1's deal team, Jenna Sleefe (*"Sleefe"*), contacted

Corbin and arranged for a meeting with him at the Company's New York office.

46.     The purpose of the meeting was to further introduce K1 to Corbin with the hope of possibly making an equity investment in the Company.

47.     Following this meeting, K1 continued to court Corbin.

48.     Another member of K1's deal team, Christian Grant ("*Grant*"), arranged a second in-person meeting at the Company's office at the end of June 2018.

49.     A third meeting was then arranged between Corbin and Grant.

50.     Accompanying Grant at that meeting was defendant Simon Yu ("*Yu*"), a 28 year old Vice President at K1.

51.     During the meeting, Grant and Yu presented Corbin with a term sheet in which K1 expressed interest in investing in the Company.  The term sheet valued theIRapp at $20 million (pre-money).  K1 was prepared to invest $6.6 million, which translated to K1 holding a 31.3% minority ownership interest in the Company.

52.     During the various meetings Corbin had with Sleefe, Grant and Yu, they conveyed to Corbin the importance of the relationships K1 fosters with the founders of companies they invest in and that among other venture capital and private equity firms, K1 is known for representing the epitome of  being "*founder friendly*."

53.     In particular, they acknowledged the challenges that entrepreneurs like Corbin face in building and growing a technology company, especially where a technology solution like theEMPLOYEEapp never before existed.

54.     In trying to "sell" K1 as a "partner" to Corbin, Sleefe, Grant and Yu highlighted the support that they provide founders like Corbin and that, in addition to their financial support, K1 had an operations management business that would help Corbin grow as an executive and

equip him to grow his company faster.

55.     As part of the K1 partnership, they committed to helping Corbin and to provide Corbin with the resources necessary to not only grow the Company, but also to help him professionally as the leader of a tech company.

56.     This commitment was very important to Corbin and something he relied upon in deciding to eventually move forward and partner with K1.

57.     However, Corbin would later learn that such assurances and commitments were just a sales tactic that K1 uses to seduce founders of small tech companies to enter into an exclusive letter of intent arrangement so that they would be precluded from working with K1's competitor venture capital and private equity firms.

58.     On behalf of and with the Company's approval, Corbin signed the K1 term sheet on August 29, 2018.

59.     At this point, extensive due diligence of the Company by K1 began (the "*Due Diligence Period*").

60.     During the Due Diligence period, K1 and Corbin had discussions regarding the competitive landscape as well as possible consolidation in this new and burgeoning market of employee communications applications.

61.     K1 asked whether Corbin would be interested in or consider acquiring another similar tech company especially, since over the past few years, other "employee communications applications" companies had started to crop up, especially in Europe.

62.     StaffConnect from the United Kingdom was mentioned during these conversations and Corbin responded that he might be interested in exploring this.

63.     More than two months into the Due Diligence period, on November 21, 2018,

Grant invited Corbin to dinner in New York City.

64.     At the end of the dinner, Grant informed Corbin that K1 had arranged for the Company to acquire StaffConnect.

65.     Since signing the term sheet at the end of August, Corbin was never made aware that K1 was also having discussions with StaffConnect about the Company purchasing StaffConnect.

66.     Only after the transaction between Corbin's company and K1 had closed did Corbin learn that in many instances, K1 would start a discussion with a company and entice the company's founder to sign an exclusive term sheet in which K1 would agree to only make a minority investment in the company whereby the founder wouldn't have to give up control of his or her business.

67.     During the exclusive term sheet period, K1 would then have the same thing take place with another company that it intended to merge with the first company.

68.     Then, only at the 11th hour after extensive due diligence had taken place and significant attorney's fees incurred, would K1 then inform the companies of their real plan; the deal would no longer be for K1 to make a minority investment but rather, K1 would require a majority ownership interest and control over the soon to be combined company.

69.     theIRapp, Inc. was the platform company and StaffConnect was going to be its first acquisition.

70.     Grant informed Corbin that in order for K1 to consummate the transaction, it would require that K1 own a majority interest in the combined company.

71.     Corbin told Grant that he would want to discuss this point separately but Grant made it clear that it was not a negotiable point and that without a controlling interest, K1 would

*not* invest in either Company and, notwithstanding the amount of time and money already spent doing due diligence, K1 would walk away from the deal.

72.     It was clear to Corbin that acquiring StaffConnect and requiring that he give up a majority interest in the combined Company was K1's plan from the beginning and this was why he was not informed about the extensive discussions K1 was having with StaffConnect.

73.     However, and in spite of K1's ulterior motives and for the sake of the Company, growing it and remaining competitive, Corbin believed it was necessary to continue to work with K1 towards a closing and funding to assist in the Company's growth.

74.     On December 14, 2018, the Company and K1 entered into a new letter of intent that, while not mentioning StaffConnect by name, incorporated the acquisition of it as part of the transaction.

75.     The terms of the new deal were as follows:

- The Company would acquire 100% of StaffConnect.

- K1 would invest $14.7 million in the combined company ("*ComboCo*") in exchange for an approximate 55.8% equity interest.

- ComboCo would now be valued at $27.75 million ($20 million for APPrise Mobile and $7.75 million for StaffConnect).

- Corbin would be diluted to a minority shareholder in ComboCo.

76.     As part of the transaction, Corbin would be the CEO of the global ComboCo.

77.     On February 14, 2019, the transaction closed with the Company acquiring StaffConnect (the "*Closing*").

**THE EMPLOYMENT AGREEMENT**

78.     Simultaneous with the Closing, on February 14, 2019, Corbin and theIRapp

entered into the Employment Agreement, which set forth the terms, conditions and privileges of his employment.

79.     The Employment Agreement provided that Plaintiff Corbin was the "Chief Executive Officer," and that the "Company may change responsibilities, and/or duties as the Company's needs change, provided that You [Corbin] **shall remain the Chief Executive Officer of the Company**. (*See*, Ex. 1, emphasis added.)

80.     Remaining the Chief Executive Officer of the Company was a critical aspect of the Employment Agreement and Corbin would not have entered into it if there was a chance that he would not remain the CEO.  Having previously rose through the ranks at KCSA to become its CEO and then having founded and invested everything he had in the Company, Corbin would only enter into a deal with K1 if they agreed that he should remain with the Company as CEO. K1 knew this and therefore agreed to it in the Employment Agreement.

81.     In the event Corbin's employment was terminated by theIRapp without cause or by Corbin for good reason, Corbin had the option of a "Put Right" and to cause the Company to purchase all or a portion of his shares in the Company at a predetermined, agreed upon and set valuation of $1.42 per share.

82.     Specifically, the Employment Agreement provided that:

> "You shall have the right to cause the Company to repurchase all or a portion of the Company's common stock held by You as of such termination date by delivering to the Company a written notice (the "Put Notice") requesting such repurchase (the "Put Transaction") no later than within sixty (60) days from such termination date. The purchase price for each share of common stock subject to the Put Notice shall be $1.42 per share of common stock." (See, Ex. 1.)

83.     Corbin was issued and owns 8,390,313 shares (See share certificate as "Ex. "2").

84.     If exercised in full, the Put Right would require the Company to pay Corbin

$11,915,245 for all of Corbin's 8,390,313 shares at the previously agreed price of $1.42 per share.

85.     In addition to the Put Right, if Corbin's employment was terminated without cause or by Corbin for good reason, Corbin was entitled to severance payments (*"Severance"*):

> A separation payment equal to the greater of (A) twelve (12) months of Your Base Salary at the rate in effect on the applicable termination date, or (B) Your Base Salary at the rate in effect on the applicable termination date that would have been payable between the applicable termination date and the two-year anniversary of the Effective Date ((A) or (B) the "Separation Payments"), with such amount divided and paid in equal installments over the applicable number of months in accordance with the Company's payroll schedule then in effect, beginning on the first Company payroll date following the applicable Trigger Date (defined in the next paragraph) but in no event less frequently than monthly.

86.     Corbin's Base Salary is $225,000.

87.     The Employment Agreement provided that Corbin could terminate the Employment Agreement if "Good Reason" existed.   "Good Reason was defined in the Employment Agreement as follows:

> "(i) the Company (c) **commits a material breach of this Agreement**… (ii) You provide written notice to the Company of any such action within ninety (90) days of the date on which such action first occurs and provide the Company with thirty (30) days to remedy such action (the "Cure Period"); (iii) the Company fails to remedy such action within the Cure Period; and (iv) You resign within thirty (30) days of the expiration of the Cure Period. Good Reason shall not include any isolated, insubstantial, or inadvertent action that (a) is not taken in bad faith, and (b) is remedied by the Company within the Cure Period." (Emphasis added.)

88.     The Employment Agreement was extensively negotiated between Corbin and Yu, as an agent and on behalf of K1.  Both Corbin and K1 were represented by counsel in connection with the negotiation and execution of all deal terms and documents, including the Employment Agreement.

89.     The Put Right was an essential part of the Employment Agreement and Corbin would not have entered into the Employment Agreement or consummated the transaction with K1 without the Put Right.

90.     The reason for this was that following the Closing, Corbin would continue to own a significant percentage of the Company's stock and, if K1 decided to terminate Corbin as CEO, Corbin wanted to have the ability to be paid for the value (expressed in the number of shares he owns) of the Company that he had worked so hard to build since he would no longer be working for the Company.

<u>**THEIRAPP BREACHES CORBIN'S EMPLOYMENT AGREEMENT**</u>

91.     On January 13, 2020, defendant Morgan, the Executive Chairman of the Company's Board of Directors, and defendant Yu, on behalf of the Company, informed Corbin that they had bad news for him.

92.     Morgan and Yu met with Corbin and told him that he would no longer be CEO of the Company and that the Company would be searching for a new CEO (the "*Termination Discussion*").

93.     During the Termination Discussion, Morgan and Yu commended Corbin for having done a great job in growing the Company from nothing to nearly $5 million in ARR.

94.     Morgan stated, **"Very few people are able to accomplish what you [Corbin] accomplished in such a short period of time, especially in founding and creating a technology that never existed before and then, being able to sell such a technology to major enterprise companies in significant industries."**

95.     Morgan also said, **"only one in 100 individuals who founded**

**technology companies could accomplish this and for this you [Corbin] should be proud."**

96.     However, they went on to say that taking the Company to $25 million in revenue required a different skill set that they, on behalf of the Board, believed Corbin did not have.

97.     Therefore, they on behalf of majority owner K1, were terminating Corbin without cause and they stated that they would now begin a search for a new CEO.

98.     K1, through its operations division, had already started to search for Corbin's replacement.

99.     When Corbin asked who was going to lead the Company in his absence and in the interim, Yu and Morgan informed him that Doug Pierce (*"Pierce"*), the Company's Chief Operating Officer, was stepping into the CEO position, effective immediately.

100.    Further, Corbin was informed that he no longer should come into the office.

101.    The next morning, on January 14, 2020, Morgan communicated to the Company's leadership team that Corbin was no longer the CEO and that a search was being started to find his replacement.  Corbin was not invited to this meeting.

102.    However, by 9:30 AM, Corbin started to receive text messages from employees saying things such as **"I'm quite in shock and so sorry about the news"** and **"Just wanted to reach out and say I was really saddened by the news this morning. I want to thank you for the huge opportunity that Apprise Mobile has been for me."**

103.    Corbin was informed that an "all-hands-on deck" meeting before all employees of the Company, including those from StaffConnect in the UK, was going to take place at 11:00

that morning.

104.    In advance of this, Corbin reached out to Morgan asking to meet with him "to discuss the communication to the employees as well as to customers and prospects."

105.    At first Morgan tried to put Corbin off until after lunch.  However, when Corbin told Morgan that he knew about the 11:00 AM meeting, Morgan agreed to speak with Corbin by phone.

106.    During this call, Corbin asked Morgan what the planned communication to the Company was going to be.  Morgan said that it would be the same as what he and Yu had said to Corbin the day before – that very few people are able to accomplish what he had accomplished in such a short period of time and that only one in 100 individuals who founded technology companies could accomplish this and for this Corbin should be proud.

107.    From what Corbin was told after the 11:00 AM meeting, this is what Morgan and Yu said to the Company.  They thanked Corbin publicly for his great work in building the Company from nothing to nearly $5 million in ARR and explained that to get the Company to $25 million required a different skill set and therefore they were going to begin a search to find this person to replace Corbin as CEO.

108.    In the interim, they told all employees of the Company that Pierce would be in charge.

109.    On January 17, 2020, Pierce and Dhrushti Sinha, the Company's People Operations Manager, held a company-wide Q&A session to allay concerns and answer questions regarding Corbin's departure as CEO.

110.    In furtherance of his role as interim-CEO, Pierce emailed Corbin on January 21, 2020 the following:

"Hey –
Do you mind changing the owner of the daily leadership standups to me?

. . .

Your weeklies with Donald, Mike, Skip can just be deleted and we'll set a
new series.

I don't think there are other recurring meetings owned by you that we
need, but LMK if you find others.

Sorry to have to ask

Thanks
Doug"

111.    Against his wishes, Corbin was promptly removed from the Company's systems,

such as LastPass, Slack (including the Leadership channel) and Sugar (the Company's Customer

Relationship Management solution).

112.    Corbin's access to the shared company Google Drive was removed.

113.    Corbin was also removed from the All Company email distribution.

114.    Corbin was no longer included in any leadership meetings, management meetings

or planning sessions.

115.    The Company and K1 also stopped sharing information with Corbin.

116.    Outside of the Company, the Company communicated to third parties, including

clients, former employees, business partners and executives at other K1 portfolio companies that

Corbin had transitioned out of the position of CEO, stepped back from operating the business,

and/or moved on.

117.    The agendas for weekly leadership meetings included "CEO Interviewing" and

"moving forward."

118.    On January 30, 2020, Corbin received another email from Pierce stating the

following which further demonstrates that he was removed from the Company as its CEO.  Yu

and Morgan were copied on the email and Pierce would not have sent it without their approval:

> Jeff
>
> We have not yet communicated to external parties about your transition, with a few exceptions noted below.  .  .
>
> We should now begin communicating your departure to key clients particularly those with pending meetings.
>
> I would like your input on the proposed message points.  We are willing to say or imply this was voluntary or say or imply it was involuntary but amicable.  What are you most comfortable with? . . .
>
> **PROPOSED MESSAGE POINTS:**
>
> **(1)     Jeff is moving out of his role as CEO, and is assisting the leadership team and Board to identify a new CEO**
> **(2)     Jeff has done a great job getting APPrise Mobile and theEMPLOYEEapp to its current stage of growth, and has been instrumental in hiring the leadership team currently in place**
> **(3)     Jeff continues to work with the business as a strategic advisor, and remains a significant shareholder and advocate**
> **(4)     The current leadership team including Doug, Josh, Dave, Amy continue with the company and are leading the delivery and support of theEMPLOYEEapp (StaffConnect) to your business**
>
> Exceptions already communicated based on circumstances
> -      Tokyo Electron – prospect
> -      Toyota UK – client
> -      Chameleon – partner
>
> (Emphasis *not* added.)

119.     Corbin did not respond to Pierce's email nor did he ever agree to the proposed

message points.

120.     On or before February 7, 2020, the Company commenced the process to screen

and hire a new CEO, and a candidate visited the Company's office on February 7, 2020 and was

interviewed by several employees.

121.    On that same day, the CEO of another K1 portfolio company messaged Corbin saying, **"Jeff, I was reaching out to [*sic*] via AppRise and I think I heard you had moved on.  I would love to touch base with you my friend.  Let me know if you are up for a conversation sometime."**

122.    On January 17, 2020, Corbin spoke with Yu by phone where Yu confirmed, again, that the Company was looking for a new CEO

> Corbin: "You said on Monday that you were going to start a search for a new CEO.  Is that still the plan?
>
> Yu: "That is still the plan."

123.     During the call, Yu also stated the following:

> Let's have a heart to heart conversation on what the right path forward looks like . . .  We're not trying to screw you.  We just need to do right by the Company and the shareholders and hopefully the right outcome for you as well.  **The elephant in the room is the put right** and, as you know, the reality is that the company is not in a position to fund that put right if you were to choose to exercise it.  .  . (*Emphasis added.*)

124.    He also said, "I would kind of say that **exercising the put right would be somewhat of a nuclear option** because it would kind of force us to really evaluate . . . what we want to do with the business if the alternative is to fund the put right." (*Emphasis added.*)

125.    During that telephone conversation, Yu went on to offer Corbin the following two options: (i) the Company would continue to pay Corbin as an employee but not as CEO with his current salary that would, (as interpreted by Yu), *not* trigger termination or Corbin's ability to exercise the Put Right or (ii) Corbin could enter into a separation agreement now and extend the window under the Employment Agreement beyond the 60 days for Corbin to consider whether to

exercise the Put Right.

126.    Specifically, Yu, acting in bad faith while offering his scholarly interpretation and legal opinion of the Employment Agreement, stated on behalf of K1,

> "What triggers the put right . . . is a termination with some details behind that.  But what doesn't trigger the put right is a role where we continue paying you as an employee **even if your title changes**, your roles and responsibilities change, that would not be a termination and therefore not trigger the put right and would give us a bit more time.  .  . We're not in a position to fund the put right today however if the business were to improve as we hope it does, we can always pick up this conversation later and let's find a way to give us all that breathing room. . . a couple of ways to do that. One is to say, "Jeff, we'll continue to pay you as an employee with your contracted salary so you still continue your employment that would not trigger termination or the put right.  And then, while we continue to work on the business and once things improve, we can then have a conversation about separation at that point which at that point you would still get your severance and we may be in a better position to talk about the put right.  That's one option.  The other option is to go ahead with a separation now but then negotiate a longer time period for you to consider the put right, maybe twelve months or something so that you don't have to make that decision in the next 60 days and then in twelve months we can be in a very different place. (*Emphasis added.*)

127.    By stating "even if your title changes," this statement by Yu further demonstrated K1's blatant breach of the Employment Agreement.

128.    Whether young or inexperienced, Yu had no regard for the consequences of his action, or, as fully set forth herein, Yu was acting in bad faith at the direction of his handler, Defendant K1.

129.    Given what Corbin had negotiated and what was expressly agreed to in the Employment Agreement, neither of the options presented by Yu was acceptable or fair to Corbin.

130.    Based on what Yu had said to Corbin, it was becoming clear to Corbin that K1 only realized after the Termination Discussion that its decision to terminate and replace him as CEO was a material breach of the Employment Agreement that set into motion Corbin's ability

to terminate the Employment Agreement for Good Reason and then to exercise the Put Right.

131.    K1 also realized that if Corbin exercised the Put Right, the Company would have an obligation to Corbin that would make Corbin a significant creditor of the Company.

132.    As a creditor, Corbin would now be in a more senior position to and paid ahead of K1 as an equity holder upon the occurrence of a sale of the Company (something that K1 has said is part of its plan) or any other liquidity event.

133.    K1 did not want Corbin to be able to receive payment from a sale or liquidity event before they did and would do anything they could to prevent this from taking place.

**CORBIN COMPLIES WITH ALL REQUIREMENTS UNDER**

**THE EMPLOYMENT AGREEMENT TO TERMINATE FOR GOOD REASON**

134.    On February 14, 2020, Corbin sent a letter to Yu putting theIRapp on notice for the material breach of his Employee Agreement, since he was removed from the position of and no longer was the Chief Executive Officer of the Company. He also explained that given such breach, "my right to terminate the Agreement for 'Good Reason' has been triggered." (*See*, Ex. 3.)

135.    On February 20, 2020, Defendant Askari, a principal of K1 and also a member of the Company's Board of Directors replied with a letter attempting to "cure" the breach by stating that Corbin **"shall remain in the position of Chief Executive Officer of the Company."** (*See*, Ex. 4.)

136.    In this letter, Askari also stated that to the extent there was "any dispute as to whether 'Good Reason' exists is hereby eliminated by the Company's *prompt* written confirmation hereunder that you shall remain in the position of CEO of the Company."

137.    However, such confirmation on February 20, 2020 was not "prompt" since Corbin

was terminated on January 13, 2020 and Askari's letter was sent more than one month later and only in response to and as a result of Corbin's notice of breach of his Employment Agreement and the triggering of Corbin's Good Reason termination.

138.   On March 4, 2020, in another attempt to "cure" the breach, Yu emailed Corbin stating that Corbin would **"continue to remain the Chief Executive Officer of the company as no corporate action was taken to affect your [Corbin's] removal from such capacity. While we disagree with you that you were removed as the CEO at any time, to resolve this disagreement and to the extent you think it is necessary, we hereby confirm that you are reinstated as CEO effective as of today (within the Cure Period as defined as part of Good Reason in your employment agreement with the company)."**

139.   "[Y]ou are reinstated" confirms that Corbin was, in the eyes of K1, removed from the CEO role in the first instance.

140.   Despite this written representation, no action was taken to restore Corbin to the CEO role.  He was not given access to the Company or its information, its systems, and he was denied access to the process of actually making decisions and running the Company.  Simply saying so in an email does not make it so; Yu's words rang hollow.

141.   Yu, together with Askari and another principal of K1, Defendant Banerjee (Yu, Askari and Banerjee collectively referred to as the *"K1 Directors"*), as well as Morgan, comprised four of the five members of the Company's Board of Directors (the *"Board"*).

142.   Corbin was the fifth member of the Board until March 30, 2020, when Corbin resigned from the Board.

143.    The K1 Directors alone constituted a majority of the Board and, according to the Company's Stockholders' Agreement dated February 14, 2019, voted "separately as a single class" and had the power to effect any major decision of the Company, including the hiring and terminating of the Company's CEO.

144.    Accordingly, the communication by Yu during the Termination Discussion was, in effect, a communication on behalf of the three K1 Directors and a majority of the Company's Board.

145.    Yu made his statement on March 4, 2020 as a way to get around the fact that the decision to terminate Corbin as CEO during the Termination Discussion and that was communicated to the entire Company on January 14, 2020 as well as to many members of the public, had already been made and approved by the K1 Directors since they represented a majority of the Company's Board.

146.    On Friday, March 13, 2020, a meeting of the Company's Board of Directors took place by teleconference.

147.    At this time, Corbin was still a member of the Board and, at the very end of the meeting, K1's legal counsel, acting in a conflicting role as counsel for the Company, asked for a vote on whether Corbin was still the CEO.

148.    This topic was not on the agenda for the meeting.

149.    Over Corbin's objection, and as if such Board vote would make any difference, the K1 Directors voted that Corbin was still the CEO.

150.    Morgan was not present at the meeting.

151.    On Monday, March 16, 2020, Askari sent Corbin a letter stating the following:

> As you are aware, the Board voted during our meeting on March 13th, to ratify, confirm and approve your continuance as the Chief Executive

> Officer or reinstatement as such to the extent necessary to confirm to you your position with the Company.  Therefore, even assuming that the notice of Good Reason delivered on February 14th is a valid assertion of a Good Reason event, the Company cured any such event within the Cure Period . . . extinguishing your ability to resign from employment with Good Reason. . . Therefore, our conclusion is that the events giving rise to your Good Reason notice have been cured and any rights under your Employment Agreement triggered by any alleged Good Reason event are no longer effective.

152.    Under the Employment Agreement, the Company had thirty (30) days to cure any material breach of the Employment Agreement, to the extent curable, that would give rise to Corbin's right to terminate the Employment Agreement for Good Reason (the *"Cure Period"*).

153.    K1 waited until the last day of the Cure Period to conduct this surprise vote on whether Corbin was still the CEO of the Company.

154.    Askari's letter was sent to Corbin after the Cure Period had concluded.

155.    However, given K1's bad faith actions and all that had already transpired, Defendants' breach of the Employment Agreement was not curable, nor was any cure effective.

156.    Moreover, Defendants took no steps to cure their material breach of the Employment Agreement and during the Cure Period actually took *additional* steps in furtherance of the breach:

    a.    Yu and Morgan had already communicated to employees that Corbin was no longer CEO and since the Termination Discussion, neither they nor anyone else ever (not before, during or after the Cure Period) communicated to the Company's employees or anyone else that Corbin continued to be CEO or was reinstated as CEO.

    b.    Since the Termination Discussion, throughout the Cure Period and to this day, Pierce has been running the Company as its CEO.  Pierce has been (i) making all

day-to-day decisions, including staffing and workflow decisions, (ii) presiding over all weekly staff and leadership meetings, (iii) conducting quarterly stakeholder meetings, (iv) presiding over weekly management meetings with K1 and (v) holding weekly meetings with Morgan, the Company's Executive Chairman.

c.   In addition, Pierce has taken over regular meetings with technology analyst group, Gartner, a very important relationship of the Company that Corbin used to manage.

d.   The Company continued and continues to message and communicate to other members of the public including customers, former employees, partners, other K1 portfolio companies and third parties that Corbin had been removed from the Company as CEO and such messaging and communication continues to this day.

e.   Since the Termination Discussion, Corbin has been and continues to be excluded from all meetings, Company events and information sharing.

f.   Prior to and throughout the Cure Period, Corbin continued and continues to be denied access to the Company's shared drives and other information needed to run the Company and K1. The Board of Directors and the Company continued and continues to intentionally withhold information about the Company from Corbin.

g.   During the Cure Period, Corbin's picture and biography were removed from the Company's website.

h.   Corbin was denied access to additional Company systems including JustWorks (the Company's HR system) and QuickBooks Online.

157.     As required under the Good Reason section of the Employment Agreement, on April 1, 2020, Corbin resigned from the Company. (*See*, Ex. 5.)

158.     On April 13, 2020 and within 60 days from resigning (as required under the Employment Agreement), Corbin sent the Company a notice exercising his Put Right for 8,300,000 shares of stock he owns in the Company (the "Put Notice").  (*See*, Ex. 6.)

159.     Based on the agreed upon price of $1.42 per share in the Employment Agreement, the Company owes Corbin **$11,786,000**.

160.     In addition, starting on April 1, 2020, Corbin is entitled to twelve (12) months of severance in the amount of **$225,000**.  This was to be paid monthly starting on the  first Company payroll date on April 15, 2020 but was not.

161.     Corbin fully performed his duties and obligations under the Employment Agreement and has met all conditions to receive payment of the "Put Right" and Severance.

162.     K1 has by its mere words backtracked on its decision to remove Corbin as CEO in order to, and in bad faith, frustrate the intent of the Employment Agreement which provides for Corbin to exercise the Put Right.

163.     In bad faith and self-interest to protect its investment in the Company without any regard or consideration for Corbin, the Employment Agreement that it signed, or the other shareholders of the Company, K1 and its appointed Company directors breached their fiduciary duty by interfering with Corbin's contract rights and by putting its self-interest ahead of other Company shareholders and creditors.

164.     Defendants have ignored the Put Notice and have failed to pay him for his shares as well as the Severance totaling $12,011,000 (the "Accrued Obligations").

165.     By the filing of this Complaint, Corbin seeks adjudication and judgment on the

merits of his lawful entitlement to those monetary sums contractually due to be paid to him and for a declaration of his rights in accordance with the Employment Agreement.

<u>**CLAIMS AND DAMAGES**</u>

<u>**COUNT ONE**</u>
**(Breach of Express Written Contract)**

166.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

167.    As of the date of this Complaint, Defendants remain in material breach of its express written agreement to pay Plaintiff compensation comprised of the Accrued Obligations.

168.    Despite prompt demand to do so, Defendants have failed to pay any portion of the Accrued Obligations.

169.    Accordingly, Plaintiff is owed and entitled to receive the full amount of his Accrued Obligations due to be paid to him, of which he was paid zero, plus interest, costs and attorney's fees.

<u>**COUNT TWO**</u>
**(Breach of Covenant of Good Faith and Fair Dealing)**

170.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

171.    Implicit in the dealings, agreements and understandings between Plaintiff and Defendants is a covenant of good faith and fair dealing.

172.    The covenant of good faith and fair dealing requires that Defendants not take any action that will have the effect of destroying Plaintiff's rights to receive fair compensation and promised financial benefits for his work, labor and efforts on behalf of Defendants.

173.    By failing to properly and fairly compensate Plaintiff in respect of his work, labor and efforts exerted on behalf of Defendants and in respect of the Defendants' benefit of such

work, labor and efforts, Defendants have breached the implied covenant of good faith and fair dealing.

### COUNT THREE
**(Intentional Interference with Contract by Defendants**
**Morgan, Yu, Askari, Banerjee, K1 and Defendants K4)**

174.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

175.    Defendants Morgan, Yu, Askari, Banerjee K1 and Defendants K4 are aware of and agreed to Corbin's Employment Agreement.

176.    Defendants Morgan, Yu, Askari, Banerjee K1 and Defendants K4 are intentionally and improperly precluding and interfering with Plaintiff from exercising his agreed upon right to put his shares of stock to the Company and to receive Severance.

177.    Defendants Morgan, Yu, Askari, Banerjee K1 and Defendants K4 are acting intentionally, improperly and with self-interest and self-dealing as they do not want Corbin to be able to exercise the Put Right because this would put Corbin in a more senior position to K1, an equity holder, that would entitle Corbin as a creditor of the Company to be paid ahead of Defendants upon the happening of a sale of the Company or any other liquidity event (something that Defendants have stated is part of its business plan and strategy).

178.    Because of Defendants' actions, Plaintiff has been damaged in the amount of at least **$12,011,000**.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.      On Counts One and Two, awarding Plaintiff damages in an amount of not less than $12,011,000, which is the sum of **$11,786,000** for the Put Right and **$225,000** for Severance, plus interests and costs;

II.     On Count Three, awarding Plaintiff damages in an amount of not less than **$11,786,000**;

III.    An award of prejudgment interest, costs, and attorney's fees; and

IV.    Such other and further relief that the Court may deem just and proper.

Dated: New York, New York
April 30, 2020

Respectfully submitted,

**SACK & SACK, LLP**


*/s/ Jonathan Sack*
By:    Jonathan S. Sack, Esq.

70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
jsack@sackandsack.com
*Attorneys for Plaintiff Jeff Corbin*